```
                UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,.    Case No. 2:17-cr-00563-NIQA-1
                          .              2:19-cr-00462-NIQA-1
              Plaintiff,  .
                          .    U.S. Courthouse
       v.                 .    601 Market Street
                          .    Philadelphia, PA 19106
DONALD D.A. ANDREW JONES  .
                          .
              Defendant.  .
                          .    December 16, 2019
. . . . . . . . . . . . ..     2:15 p.m.

                TRANSCRIPT OF SENTENCING HEARING
                BEFORE HONORABLE JAN E. DUBOIS
                UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For USA:                  ERIC L. GIBSON, ESQ.
                          United States Attorney's Office
                          Email:
                          USAPAE.DepartedAUSA@usdog.gov

For Donald D.A. Andrew    ALAN J. TAUBER, ESQ.
Jones:                    Law Office of Alan J. Tauber, P.C.
                          2 Penn Center
                          Suite 900
                          Philadelphia, PA 19102



Audio Operator:           M. HULL

Transcriber:              UBIQUS REPORTING, INC.
                          61 Broadway, Suite 1400
                          New York, NY 10006
                          212-346-6666
                          Email: infousa@ubiqus.com


            Proceedings recorded by electronic sound
     recording, transcript produced by transcription service.
```

**I N D E X**

**PAGE**

**OPENING STATEMENTS**

By Mr. Gibson                                    16
By Mr. Tauber                                    21

1           THE COURT:  Good afternoon everyone.  Please be

2   seated.

3           ALL: Good afternoon, Your Honor.

4           THE COURT:  I call the case of United States of

5   America versus Donald D.A. Jones, criminal number 17-563-01.

6   We have scheduled sentencing for today.  Is the government

7   ready to proceed?

8           MR. ERIC L. GIBSON:  We are, Your Honor.

9           THE COURT:  Is the defense ready to proceed?

10          MR. ALAN J. TAUBER:  Yes, Your Honor.

11          THE COURT:  Before we proceed with the sentencing,

12  I'd like to address any bail issues.  We do not have a pretrial

13  services officer present in the courtroom unless he or she is

14  in the gallery.  We don't have one.  But I don't think there

15  are any bail issues, is that correct?

16          MR. TAUBER:  I believe that's true Judge.  I haven't

17  seen a recent report, but I can't imagine there is one.

18          THE COURT:  I have the report.  And the

19  recommendation, Mr. Jones, is remain compliant with his

20  conditions of release if the term of incarceration.  And, Your

21  Honor, deems continued release appropriate, respectfully

22  recommended that defendant be permitted to, well in essence

23  self-surrender.  So we'll proceed with that, the pretrial

24  services office.  If anyone needs to see this?

25          MR. TAUBER:  No, sir.

4

```
1              THE COURT:  It's called release status report.

2              MR. GIBSON: My understanding is that Mr. Jones has

3   been --

4              THE COURT:  -- He's been totally compliant.

5              MR. GIBSON:  -- fully compliant.  And as the Court

6   knows, we allowed him to travel overseas twice.

7              THE COURT:  We did.

8              MR. GIBSON:  I don't know if there is any better

9   recommendation than that.

10             THE COURT:  Well no, we certainly trusted Mr. Jones

11  to do that.  And so we'll begin.  I'm going to start, Mr.

12  Jones, by referring to the pre-sentence report.  The pre-

13  sentence report was prepared initially November 15th, 2019.  And

14  it was revised December 9th.  Some questions for you.  Did you

15  receive copies of those pre-sentence reports?

16             MR. DONALD D.A. JONES:  Yes, sir.

17             THE COURT:  Did you read them?

18             MR. JONES:  Yes, sir.

19             THE COURT:  Did you understand them?

20             MR. JONES:  Yes, sir.

21             THE COURT:  The answer is yes sir?  Go ahead.

22             MR. JONES:  Yes.  Yes, sir.

23             THE COURT:  Good Mr. Jones. Did you discuss it with

24  Mr. Tauber?

25             MR. JONES:  I did.
```

1           THE COURT:  Fine.

2           MR. JONES:  Yes, I did, Your Honor.

3           THE COURT:  Thank you.  Mr. Tauber, do you have any

4  objections to the pre-sentence report?

5           MR. TAUBER:  No we do not, Your Honor.

6           THE COURT:  Is there anything you wish me to consider

7  adding to or removing from the report?

8           MR. TAUBER:  The only other minor comment I would

9  make is there was some reference to tax returns, whether there

10  is an indication the tax returns have not been provided.  We

11  have provided those as of last Tuesday.  And so that

12  information was in the possession of the probation department.

13  And as well as an updated financial statement.  So with that

14  qualification, we have no issue.

15           THE COURT:  Well maybe we should, you will have to

16  direct me.  The pre-sentence, I'm holding it up, it's rather

17  thick.

18           MR. TAUBER:  Yeah.

19           THE COURT:  I don't remember the precise paragraph,

20  but Mr. Lott, Michael Lott, the probation officer, will be able

21  to point me.

22           MR. MICHAEL LOTT:  Your Honor --

23           MR. TAUBER:  -- Go ahead.

24           MR. LOTT:  -- page 26, paragraph 140 addresses the

25  tax returns.

1          THE COURT: That paragraph says defendant has not

2     provided copies of his tax returns for the years 2014 through

3     2018.

4          MR. TAUBER:  And, Your Honor, if I may, this I

5     believe the final report was submitted the same day we turned

6     those over to Mr. Lott.  So that, you can confirm that.

7          MR. LOTT:  Yeah those have been received Judge.

8          THE COURT:  All right, we can change that.  And the

9     second, well let's finish this first.  I'll take out the word

10    not.  So paragraph 140 on page 26 will read the defendant has

11    provided copies of his income tax returns for the tax years

12    2014, 2015, 2016, 2017, and 2018.  And the second issue Mr.

13    Tauber?

14         MR. TAUBER:  I think that's it.  Mr. Jones provided

15    an updated financial statement.  But I think the report

16    adequately comments on his financial condition.

17         THE COURT:  Well there is a good deal of information

18    on his financial condition.  Mr. Lott, is there anything that

19    was submitted require inclusion in the pre-sentence report?

20         MR. LOTT:  No Judge.

21         THE COURT:  Thank you.  All right, with that one

22    change, we'll proceed.  I'm now going to put my guideline

23    calculations on the record.  On October 24th, 2017, a grand jury

24    in this district returned a six-count indictment charging

25    Defendant, Donald Jones, with conspiracy in violation of 18

United States Code Section 371, that's count one, causing

unlawful campaign contributions.  And aiding and abetting in

violation of 52 United States Code Sections 30109(d)(1)(A)(i),

30116, and 18 USC 2.  That's count two, causing false campaign

expenditure reports and aiding and abetting, in violation of 52

United States Code Sections 30104(a)(1)(b)(5)(A) and

30109(d)(1)(A)(i).  And 18 United States Code Section 2.

That's count three and four, causing false statements and

aiding and abetting in violation of 18 United States Code

Sections 1001(a)(1) and (2), that's count five.  And finally,

count six, false statements in violation of 18 United States

Code Section 1001(a)(2), that's count six.  That was the

indictment initially filed in this court.  Defendant pled

guilty to count six of the indictment on December 8th, 2017.  On

December 18th, 2017, the United States Attorney's office in the

Western District of Missouri filed a one count information

charging Defendant, Donald Jones, with conspiracy to commit

theft or bribery, involving programs which received federal

funding in violation of 18 United States Code Sections 371 and

666(a)(1) and (a)(2).  Defendant pled guilty to count one of

the information that was originally filed in the Western

District of Missouri.  Defendant pled guilty to Count one of

the information found in the Western District of Missouri on

December 18th, 2017.  On October 14th, 2019, the Missouri action,

on consent of the defendant, was transferred to this district

1   for disposition and sentencing.  It was assigned criminal

2   number 19-462.  The current addition to the guidelines manual

3   will be used at sentencing.  Use of that addition of the manual

4   presents no espouse facto problems.  On this issue, the Court

5   notes that pursuant to the Supreme Court decision in *United*

6   *States vs. Booker*, the guidelines are now advisory, they are no

7   longer mandatory.  The offenses of conviction in criminal

8   number 17-563-01 is count six, and criminal number 19-1-342,

9   represents substantially different offense conduct that is not

10   otherwise accounted for in the guidelines applicable to each

11   event.  Therefore, a combined defense level is determined

12   according to the grouping procedure detailed in Section 3-D

13   1.01.  Count six in criminal number 17-563-01 charges a

14   violation of 18 United States Code Section 1001(a)(1).  The

15   defense guideline applicable to 18 United States Code Section

16   1001(a)(1) is 2B1.1.  This section includes a cross reference

17   in section, cross references in section 2B1.1 that states and

18   this is a little heavy to follow but I'm going to put it on the

19   record.  It's paragraph three of the cross-reference.  If A

20   neither subdivision 1 nor 2 of this subsection applies, B,

21   defendant was convicted under a statute prescribing,

22   proscribing false, fictitious, or fraudulent statements or

23   representations generally.  Such as 18 United States Code

24   Section 1001, Section 1341, Section 1342, or 1343.  And see the

25   conduct sets forth in the count of conviction establishes an

offense otherwise covered by another guideline in Chapter 2.

Apply that other guideline.  And the long and the short of it.

The Court concludes that neither Subdivision 1 nor 2 of the

applicable subsections that's 2B1.1 applies.  Defendant was

convicted under 18 United States Code Section 1001 and the

count of conviction charges a scheme to falsify, specifically

covered by another guideline.  The charge conduct violates 52

United States Code Sections 30109(d)(1)(A)(i) and 30116(f)

which are specifically covered by Section 2C1.8 of the

guidelines.  The base offense level under that guideline is

eight.  The Court finds that the value of an illegal

transactions total $90,000, pursuant to Section 2C1.8b1 and

2b1.b1d because the value of the illegal transactions exceeded

$40,000, but was not more than $95,000.  The offense level has

increased by six levels.  There are no victim related

adjustments, no adjustment for role in the offense, and no

adjustment for disruption of justice.  The adjusted offense

level for that count which is group one, is therefore 14.

Group two consists of the one count in the information

initially filed in, though it was initially filed as an

indictment in the Western District of Missouri, was filed as an

information here.  Criminal number 19-462.  The guideline for a

violation of 18 United States Code Section 666A(1)(a), the

criminal statute underlying count one of the information, is

Section 2B1.1.  Pursuant to Section 2B1.1(a)(2), the base

offense level is six.  The Court finds that the value of the

illegal transactions involved in that case is $973,807.28.

Pursuant to sections 2C1.1.8(b)(1)(h), because the value of the

illegal transactions exceeded $550,000, but was not more than

1.5 million dollars, the offense level is increased by 14

levels.  The Court finds that the offense level involved a

misrepresentation that defendant was acting on behalf of the

charitable educational religious or political organization or

government agency.  Therefore pursuant to Section

2B1.1(b)(9)(a), the offense level is increased by two levels.

There are no victim related adjustments.  No adjustment for

wrongly offense.  No adjustment for obstruction of justice.

The adjusted offense level for that count which is group two is

therefore 22.  I'm not going to recount the multiple count

adjustment that was set forth in the pre-sentence report.

There were no objections to that adjustment.  The Court agrees

with that adjustment and adopts it.  So pursuant to the move of

account adjustment, the two groups result in 1.5 units and a

one level increase in offense level to the adage of the group

with the highest level.  Group two.  Thus the adjusted offense

level for the two groups, one and two, is 23.  Defendant is

entitled to a three-level reduction in offense level for

acceptance of responsibility under sections 3E1.1(a) and (b).

There are no chapter four enhancements.  The total offense

level is therefore 20.  Defendant has no criminal history

1  points.   That places him in criminal history category one.

2  With a total offense level of 20 in criminal history category

3  one.   The guideline and imprisonment range for count six of the

4  indictment in criminal number 17-563-01 which is group one, and

5  count one of the information in criminal number 19-462 is group

6  two, is 33 to 41 months.   The government filed a downward

7  departure motion under Section 5K1.1 of the guidelines.   I

8  think what we'll do, I'll hear argument on that motion now.

9  I'll rule on whether I grant or deny the motion.   But I will

10 reserve until the end of the proceeding the extent of the

11 departure.   So I'll hear from you first.   Government counsel

12 first.

13         MR. GIBSON:   Your Honor, I don't know that I need to

14 belabor the points that were raised in the 5K motion itself.

15 Clearly, Mr. Jones provided substantial assistance not just

16 here in the Eastern District of Pennsylvania but also in the

17 Western District of Missouri.   After his indictment in

18 Pennsylvania, shortly thereafter, he did begin assisting the

19 prosecution.   Both with the two schemes that were involved in

20 the trial before, Your Honor, as well as I would say the

21 perhaps more complicated and certainly involving a greater

22 amount of funds scheme in the Western District of Missouri

23 involving a number of individuals as detailed in our 5K motion.

24 Not just the Western District but also the Districts of

25 Arkansas as well.   Mr. Jones provided information to the

prosecution.  He was corroborated by both the testimony of
other witnesses as well as records.  He made himself available
to the grand jury in the Eastern District of Pennsylvania.  He
was not requested to do so in the Western District of Missouri
but he made himself available nonetheless had they chosen to
place him before the grand jury.  Your Honor, had an
opportunity to see Mr. Jones testify.  I would say that Mr.
Jones is one of the saddest individuals that I have dealt with
in this particular vein of work.  I think that came across
during his very candid testimony here in this courtroom.  Not
to take anything away from Mr. McMonagle or his presentation, I
did not envy Mr. McMonagle the task of cross-examining Mr.
Jones.  I think he was completely forthcoming about his
participation in the schemes involved here in the Eastern
District.  And, Your Honor, got to see that.  And the jury
obviously credited his testimony, not just convicting Smukler
of the scheme for which Mr. Jones entered his guilty plea.  But
also the second scheme involving Margolies' campaign where Mr.
Jones very candidly admitted to participating in a conduit
contribution and the jury found Mr. Smukler guilty on that
count as well.  His cooperation in the Western District of
Missouri and also in the Districts of Arkansas, was laid out in
detail in a 5k motion.  A number of individuals were brought to
justice.  A number of those have already pled guilty.  At least
four individuals have pled guilty.  He was not the first one in

1    the door in that case.  But nonetheless, his cooperation

2    indicated, or was a clear signal to the other individuals, and

3    I believe they are down to two defendants left who are awaiting

4    trial.  I note that the terms of the plea agreement with the

5    Western District of Missouri require Mr. Jones to testify if

6    necessary in that trial involving the Gosses which I believe is

7    listed for trial setting sometime in 2021.  And I believe both

8    Bontiea Goss and Tom Goss are appearing in Court today in the

9    Western District of Missouri and superseding indictment.  But

10   Mr. Jones has been key, both here and west of the Mississippi.

11   And he deserves credit for that.  I would note also that in

12   this particular case, after Mr. Cranford learned that Mr. Jones

13   was cooperating with the government, unlike the situation we

14   dealt with earlier involving the prosecution here, Mr. Jones

15   was the subject of a murder for hire scheme.  As a result of

16   his cooperation with the government in the Western District,

17   Mr. Cranford took it upon himself to conspire to have Mr. Jones

18   eliminated.  And so there was a certain degree of physical risk

19   to Mr. Jones.  I think that having discussed it with Mr. Jones,

20   I think that perhaps our concerns were greater than his.  But

21   nonetheless, that happened and the government took it

22   seriously.  And as a result of that, Mr. Cranford was in fact

23   detained prior to the disposition in his trial and he is now in

24   prison.  Clearly, Mr. Jones --

25              THE COURT:  -- Has Cranford been sentenced?  He has,

1    I think.

2           MR. GIBSON:  He has and I believe he got seven years

3    if memory serves correct, Your Honor.  And so clearly, for the

4    reason stated in the motion for downward departure, it's the

5    government's position that Mr. Jones should be recognized and

6    receive the benefit of his cooperation.  He indicated he would

7    cooperate.  He did.  He provided substantial assistance in

8    several matters.  Those are significant matters both here and

9    in the Eastern District and also in Missouri.  And he deserves

10   that credit.  And so I would respectfully request that the

11   Court grant that the government's motion for a downward

12   departure as a result of his cooperation.

13          THE COURT:  Fine, thank you.  Mr. Tauber, is there

14   anything you wish to add?

15          MR. TAUBER:  Yeah.

16          THE COURT:  Again, I'm not going to rule on, pardon

17   me, the extent of the departure at this time.

18          MR. TAUBER:  Yes.

19          THE COURT:  I'll do that at the end of these

20   proceedings.

21          MR. TAUBER:  I understand, Your Honor.  And I just a

22   few points I'm just going to highlight because I will address

23   them in my remarks.  But the prosecutors in Missouri did point

24   out that Mr. Jones' cooperation was extraordinarily prompt in

25   that case.  And that he immediately he came in long before an

1    indictment or a plan to indict him.  So that was one comment

2    the prosecutors made.  My understanding is that they credited

3    Mr. Jones cooperation with at least at this point four guilty

4    pleas.  Principally a guilty plea of Rusty Cranford.

5              THE COURT:  Cranford.

6              MR. TAUBER:  Obviously who I think before he was

7    aware of Mr. Jones' participation was clearly intending to

8    fight the case at the particularly given his reaction and the

9    threat he placed on Mr. Jones' life.  There were obviously in

10   sub part four of the 5K, he talks about dangerous risks and

11   other collateral effects.  Which again, we will address in my

12   broader remarks.  But there were certainly very, very

13   substantial collateral impacts on Mr. Jones' life and his

14   wellbeing and his reputation.  More so I would submit than in a

15   typical case that would involve similar source of charges.

16   Given the way it's been reported, given the impact it's had on

17   him personally and his business, and as I said, I'll address

18   those.  But I just wanted to highlight those initial points.

19             THE COURT:  I'm going to grant the downward departure

20   motion.  I'll sign the Torres Order appended to the motion.

21   I'll rule on the extent of the departure at the end of these

22   proceedings.  All right.  I'll first hear from the government.

23   Any evidence the government wishes to present certainly oral

24   argument.

25             MR. GIBSON:  Your Honor, as I think we have made

1   clear throughout these proceedings, the nature of the offenses

2   in which Mr. Jones participated are of grave concern to our

3   democratic institutions both the electoral process and also how

4   the political process works.  Whether it works well and to the

5   benefit of all.  Or to the benefit of a select few.  For that

6   reason, while we recognize Mr. Jones significant cooperation, I

7   want to underscore again, significant cooperation both here and

8   in the Western District of Missouri.  Based on all of the facts

9   that have come before, Your Honor, in both group one, the count

10  six from the indictment hearing in the Eastern District, and

11  also from group two in the information in the Western District

12  of Missouri, it is the government's position that a period of

13  incarceration is warranted here.  Despite the fact of the

14  cooperation, the level of the conduct here is such that in

15  order for this sentence both to be a deterrent to the general

16  public, as well as to demonstrate to the public that there will

17  be accountability for these types of offenses, some measure of

18  accountability is warranted.  I mean the dollar figure involved

19  in the Western District of Missouri, $973,807, that's not

20  insignificant.  And that's the amount that passed through Mr.

21  Jones' company.  As it relates to specifically the offenses

22  here, while Mr. Jones pled guilty to only a count charging him

23  with participation in the 2012 scheme, I would note that there

24  was also participation in the 2014 scheme as I alluded to

25  during the discussion of the 5K1 departure motion.

1              THE COURT:  Well those two checks which were signed

2    by Mr. Jones, one was charged, the $25,000 check in scheme one,

3    the 2012 primary election.  And the second was a $2,500 check.

4              MR. GIBSON:  I believe it was $2,600 but I could be

5    mistaken about that.  It was the legal contribution limit for

6    the 2014 race regardless, that's the point.

7              THE COURT:  And that was not charged.  But --

8              MR. GIBSON:  -- It was charged.  But we did not

9    extract a plea from Mr. Jones to it.  And we did not charge Mr.

10   Jones to it.  Because it came in the superseding indictment.

11   In other words, the initial indictment if, Your Honor, recalls

12   charges just the 2012 piece.

13             THE COURT:  Yes.

14             MR. GIBSON:  Mr. Jones agreed to cooperate.  There

15   was a superseding indictment after that charging the 2014.  We

16   did not extract an additional count from Mr. Jones.  My point

17   merely is that there was participation in both schemes by Mr.

18   Jones.  Who again as I don't think is necessary because I know

19   the Court heard his testimony and is familiar with his

20   background.

21             THE COURT:  Yeah I did, I certainly did.

22             MR. GIBSON:  This is a sophisticated political

23   operative.  And as he explained to the jury, he knew full well

24   what he was doing as it relates both to the 2012 scheme and

25   also when Mr. Smukler came to him and asked him to make the

1   conduit contribution.  He knew full well what he was doing.

2   Now I'm not saying that he shouldn't get recognized for his

3   substantial cooperation.  Absolutely he should.  Absolutely he

4   should.  But the heart of it, group one, goes to our electoral

5   processes.  And the damage that can be inflicted by corruption

6   of the electoral processes is difficult to quantify.  Public

7   looks at what happens in our electoral processes and

8   participation can diminish as a result if they see, if they

9   think that the electoral process is not functioning in the way

10  that it should.  If it encompasses a certain degree of

11  corruption.  And then turning to the Western District piece of

12  it, Mr. Jones services in that regard, lobbying in and of

13  itself is not illegal or inappropriate under most

14  circumstances.  Nor is advocacy for a particular organization.

15  However, the facts of that circumstance where we're looking at

16  a charity that is using federal funds to provide services and

17  is barred specifically from using that money, to advocate for

18  additional money for itself, or any other favorable legislation

19  right, or some outcome that it wants from politicians that

20  favor the charity, while the charity and its board members are

21  looting the charity, that's the situation that we're talking

22  about here.  And while Mr. Jones in certain circumstances

23  appears to rather than have engaged as a full-throated

24  conspirator as say Mr. Cranford for example or Mr. Cooper, at

25  the very best you can say that it was willfully blind to what

1   he knew was problematic at the time.  And that's reflected in

2   the guilty plea that he entered in the Western District.

3   Again, my point just is that the political system needs to work

4   free of corruption and the public needs to be confident that

5   it's operating free of corruption.  And where corruption of the

6   scale and the magnitude is uncovered as it is here, a measure

7   of accountability is required for those who participate.

8   Absolutely Mr. Jones should get credit for his participation.

9   I draw a distinction between the circumstances --

10          THE COURT: -- You said participation, you mean

11  cooperation.

12          MR. GIBSON:  Yes, forgive me.  I draw a distinction

13  however between the circumstances which Mr. Jones presents to

14  the Court and the circumstances that Mr. Moore presented to the

15  Court a few days ago, where we're talking about a single

16  isolated scheme without any additional record.  There is a

17  larger canvas here before the Court on which Mr. Jones has

18  unfortunately fastened some paint that does not reflect well on

19  him.  And again, some measure of accountability is required

20  here.  But again, I just will repeat, I don't wish to diminish

21  his cooperation.  He cooperated here.  He cooperated in the

22  Western District of Missouri.  He was available whenever he

23  needed to be available to us.  He committed to grand jury

24  proceedings.  He appeared in grand jury proceedings.  He

25  appeared in trial proceedings here.  His testimony in my

1    judgment was compelling.  It was certainly helpful to the jury

2    in reaching the verdict that they did.  It was certainly

3    helpful in holding Mr. Smukler accountable.  And those are to

4    his credit, and he deserves credit for that.  But again, there

5    was the reality of the circumstances under which he finds

6    himself here.  And that the piece involving the Western

7    District of Missouri involves a certain level of pecuniary gain

8    that was not present in the case before, Your Honor, for trial

9    and that also --

10             THE COURT:  -- And that continued for five years.

11             MR. GIBSON:  Yes, sir.  Yes, sir.  And so I'm sure, I

12   don't doubt, that if Mr. Jones could take it back, he would.

13   But nonetheless, we're here and we need to deal with the facts

14   as they're presented to the Court.  Credit him with his

15   substantial assistance but at the same time, recognizing that

16   the 3553 factors and the purposes of sentencing require that

17   the public see accountability for misconduct of the scope and

18   the scale that is present before, Your Honor.  Thank you.

19             THE COURT:  Thank you.  Mr. Tauber?

20             MR. TAUBER:  May I?

21             THE COURT:  Mr. Tauber?

22             MR. TAUBER:  Thank you, Your Honor.  Your Honor, I'd

23   like to just introduce all that are here for Mr. Jones on his

24   behalf.  I don't intend to call them as witnesses but I'd like

25   the Court to know who is in the courtroom.  There are several

1    individuals who have known Mr. Jones probably for I don't, most

2    of his adult life is my belief.  They've worked with him in the

3    past in doing political organizing and other government affairs

4    and I'll just introduce them.  Mr. Bill Durham [phonetic] who

5    was an organizer.  I believe Mr. Durham was also a government

6    affairs representative for LaSalle University if I understand

7    that right.  Steve Vaughn [phonetic].  Greg Nailer [phonetic].

8    And then Chester Bolt [phonetic], I guess is not here.  Okay.

9    Well was here.  Okay.  Also seated next to Mr. Jones is Robert

10   Lehand [phonetic] was counsel early in the case and he may have

11   some remarks for the Court as well.

12           MR. ROBERT LEHAND:  Good seeing you again, Your

13   Honor.

14           THE COURT:  Good seeing you.

15           MR. TAUBER:  Your Honor, I just want to begin my

16   address and the Court received a sentencing memorandum from me

17   that tried to fill in some of the gaps that were not in the

18   pre-sentence report and wouldn't typically be in the

19   presentence report.  And that is Mr. Jones personal

20   professional background.  As the Court knows, he was born and

21   raised in Philadelphia.  His mother, his father was a college

22   professor, his mother was a social worker.  He was raised in

23   the crucible of the Civil Rights movement in the 60s and 70s.

24   And his parents were both very personally involved in that.

25   And their involvement and their influence was very indelible on

1  Mr. Jones.  At the young age of 15, Mr. Jones began what became

2  a lifelong I call it in the memo a vocation because even though

3  it became his profession, it was in fact calling.  And I think

4  that's best evidenced by the fact that he began doing this work

5  at the age of 15 and continued doing it as a volunteer for many

6  years, continued doing it while he was engaged in other

7  employment as a volunteer.  And then eventually it became a

8  profession for him as he gained experience and expertise. His

9  career began at the age of 15 working for the mayor campaign of

10  Hardy Williams.  He worked after that he worked for many years

11  registering voters in such places as South Carolina, Alabama,

12  and Mississippi.  These are not particularly (inaudible) places

13  for the population Mr. Jones was organizing.  It was not

14  without a certain degree of morale and physical courage that he

15  undertook these efforts.  As he became more sophisticated with

16  respect to political organizing, he became involved in

17  political campaigns that were focused on his community.

18  African American community.  Traditionally underrepresented,

19  traditionally disenfranchised, and he participated, I think

20  you, know to his great honor in many firsts.  He helped Ron

21  Kirk become the first black mayor of Dallas, Texas.  He helped

22  Lee Brown become the first black mayor of Houston.  He helped

23  Sharon Pratt Kelly become the Mayor of Washington DC, replacing

24  Marion Barry.  Sharon Pratt Kelly came in to run when Marion

25  Barry's career ended in disgrace and a host of, I remember this

because I lived in Washington at the time.  And a host of city council members who essentially, you know, quietly abetted Marion Berry's administration were all running.  And then she came from nowhere and ended up becoming the Mayor of Washington DC.  Thankfully.  He was involved in many congressional campaigns across the country.  Many of our great congressmen got to know Mr. Jones as they came.  Elijah Cummings.  Mr. Jones was involved with his first election, a very beloved chairman of the judiciary committee just passed away.  Bobby Rush, Jesse Jackson, Stephanie Tubbs Jones, Harold Ford.  Ford Flegg [phonetic], Arthur Davis, just to name a few across the country.  He worked on the presidential campaigns of Tom Harkin, Al Gore, Howard Dean, Hilary Clinton.  In Pennsylvania, he worked for Harris Wofford.  And untold numbers of local candidates in Philadelphia.  He also has had the great privilege of taking his expertise overseas and working in other places where the black populations have been traditionally disenfranchised.  So he organized voters in England.  In Sweden, he helped to elect one of the first black candidates.  In Sweden.  And the same in France.  When I talk about Mr. Jones doing this work as a vocation, it really that characterization really hit me as I read the letters of reference that came in over the last several months.  All of which have been supplied to the Court.  I tried to summarize them.  But I think the Court can tell from these letters that

1    the work Mr. Jones did was not just a business.  So many of

2    those letters talked about how Mr. Jones gave them their first

3    job.  They had no experience.  Internships, first jobs.  He

4    gave them introductions to others.  He helped them on their

5    way.  They talked about how he has helped the next generation

6    of organizers and leaders.  And many of them said what was

7    remarkable about what he was doing was he did these things with

8    no expectation of reward.  They were in many respects he did

9    this voluntarily.  And I just I spent a fair amount of time

10   trying to summarize those letters.  But in preparing for

11   today's remarks, I just have to I feel it's critical to again

12   comment as I did in the memo.  It's obvious that Mr. Jones did,

13   he did not, as the Court knows, he did not get rich as a

14   political consultant.  He did make a living at it.  He made a

15   decent living.  But it was at least as much a living as it was

16   a passion.  And I think in the letters you continually see the

17   words of people describing his willingness to help.  His

18   personal sacrifice.  One person said that he has worked on

19   many, many Pennsylvania campaigns and doesn't know a more

20   righteous person in his experience.  Others talked about how

21   the communities they live in are better places because of the

22   people Don Jones helped to elect.  Others talked about his

23   generosity both in time, and money, and resources.  I will

24   never forget his generosity as one writer stated.  Others

25   talked about how he was a mentor to them.  Lessons learned from

1  a person that they hold in the highest regard.  Another writer

2  talked about how he has tried to build a new generation of

3  organizers.  He was an inspiration to me as a young organizer.

4  His excellence reputation in the community and others talked

5  about how he displayed his devotion to his family.  And how he

6  was a true friend.  And he is devoted to his family.  I don't

7  want that to be lost in these bigger comments.  But Mr. Jones

8  has been faithfully married to his wife for 34 years.  He has

9  raised two adopted children who he adores and loves and raised

10  with kindness.  As the Court considers what an appropriate

11  sentence is, it is completely appropriate and necessary to

12  consider the collateral consequences that Mr. Jones' conduct

13  indictment play and sentence has and will have on him.  First,

14  it has been a catastrophic loss of his business.  A business

15  that is built upon reputation and trust and belief and he

16  understands what his actions have done.  I think if the Court

17  looks at the financial records you'll see in 2016, he earned

18  about $88,000 net.  Those are net numbers.  In 2017, $77,000.

19  And 2018, he made $17,000.  So this case has a particular toll

20  on his business.  Nonetheless, he has continued to fight for

21  his business.  He has continued to fight for the causes he

22  believes in and people who are worthy as you know.  Mr. Jones

23  travelled abroad on the two occasions in his pretrial

24  detention.  Went to England where he tried to assist the

25  liberal democrats.  And counsel them.  I think sadly to

1   unfortunately to no great effect since this last election has

2   proven.  But it's no fault of Mr. Jones' as I have to tell you.

3   There are bigger issues there.  He went to Ghana and he

4   explained to me that he was called by the People's Party, which

5   is a minority party, a large minority party.  Ghana has found

6   oil.  And there are a lot of different interests trying to get

7   control over what that oil revenue is going to be.  The

8   People's Party which is the minority party is going to be

9   running for election.  It does not represent the business

10  interest.  It does not represent you know the corporate

11  interests.  And they're hoping to you know win a majority and

12  find uses for the oil revenue to serve everybody in that

13  country.  And that's primarily why Mr. Jones went there to help

14  them.  Number two, he as it's obvious, Mr. Jones has a

15  considerable loss of reputation.  Reputation he built over a

16  lifetime, 47 years in this business.  What is particularly

17  unusual in Mr. Jones' case is that there is a great deal of

18  newspaper coverage of this case, obviously.  That is more, that

19  is not common in a let's say white collar context by and large.

20  But because this has involved elected politicians, and people

21  of notoriety, it's obviously drawn a lot of newspaper coverage.

22  That has had a particular hard effect on Mr. Jones not saying

23  it's not fair, it's not right, but in weighing a sentence and

24  trying to consider what would be a fair comparison, the

25  consequence of news coverage in this case makes the collateral

1   consequences more severe for Mr. Jones and others.  And then

2   the last thing I want to point out, and this was obviously

3   raised by Mr. Gibson and the Court is well aware of it, is Mr.

4   Jones' cooperation, and we talk about this in every case where

5   there is cooperation.  We stand here and talk about the thread

6   of people, the jail finds out you have cooperated, there is a

7   risk and so forth.  But what we know in this case, is this is

8   not just an abstract idea.  This is not a concept.  There was

9   an actual contract on Mr. Jones' life.  And I remember the day

10  I received a call telling me to convey to Mr. Jones that he

11  should not leave the area of his house for several weeks.

12  Without any more detail being told to me, I obviously assumed

13  that there was some kind of danger.  But this was a very real

14  thing.  A desperate man contacted a person of known, with a

15  known  violent past, thankfully he had a past that cooperated

16  with the FBI.  But he contacted a person who knew had a violent

17  past.  He paid him money.  He offered a firearm.  He told him

18  he needed Mr. Jones to be eliminated.  And he had reason to be

19  afraid.  And he has gone to jail.  And everybody took this very

20  seriously.  And I supplied the Court with the pretrial

21  detention memo from the Western District of Missouri.  Which

22  contained, the majority of which contained this scheme that

23  Rusty Cranford tried to execute.

24          THE COURT:  This was the memo submitted by the

25  government?

1          MR. TAUBER:  Correct, right.  Well as an exhibit, I

2    provide, yes, it was the government's detention memo and Mr.

3    Cranford's --

4          THE COURT:  -- And he was detained?

5          MR. TAUBER:  And he was, yes that's correct.

6          THE COURT:  Is Cranford is the person to whom?  The

7    defendant kicked back --

8          MR. TAUBER:  -- Correct.

9          THE COURT:  -- about a quarter of a million dollars.

10         MR. TAUBER:  That's correct, Your Honor.  That's

11   correct.  And I am going to address that because this was you

12   know this was not something Mr. Jones was offering.  It was

13   essentially demanded by him.  So it's not as, and I will

14   address that when I get to the nature of the offenses.  This

15   was money that was demanded of Mr. Jones.  It wasn't offered

16   for continued business.  But what and you'll hear from Mr.

17   Jones about this and what effect this has had on him.  But you

18   know the most immediate threat has probably passed.  But Mr.

19   Jones will go through his life a, looking over his own shoulder

20   and wondering if this man will come back to retaliate against

21   him.  And two, worrying about his family as well.  Because he

22   knows that he has in some way potentially put his family at

23   risk.  Because if they are with him, or if they can't get to

24   him, or Rusty Cranford couldn't get to him, they may get to his

25   family.  But be that as it may, this is a real consequence that

1  again is different in nature than it is in a typical case where

2  you have somebody cooperating where the threat of retaliation,

3  while meaningful, is often abstract.  It's not abstract here.

4  We talked about Mr. Jones cooperation and it's my understanding

5  that, you know, your Court heard him testify.  He was very

6  compelling and obviously very helpful in the government's

7  prosecution.  With respect to the Ms. Vinsky [phonetic] piece,

8  it's my understanding that he gave very critical information

9  that was corroborative of the government suspicions.  And was a

10 really key witness in supporting that superseding charges.  I

11 address the Missouri cooperation where he was credited with

12 bringing about at least at this point four guilty pleas.  And

13 there is a superseding indictment currently pending.  I'd like

14 to address Mr. Jones' role in the offenses.  And I think this

15 is really important.  It's a really important point.  And I

16 thought about discussing it first.  But I think it's really

17 important because what you see with both of these cases is what

18 I would describe as a failure of will as opposed to a

19 volitional or directed conduct.  In other words, in

20 Philadelphia, Mr. Jones did not seek this out.  He did not

21 participate in the planning.  Or direct any action.  In fact,

22 he thought it was a bad idea and he told parties of the

23 conspiracy that it was a bad idea.  In the end of the day, did

24 he participate in it, yes.  But I submit that that is a

25 difference in kind of somebody who willfully sets something in

1   motion.  And somebody who because of lack of will agrees to

2   participate in the criminal act.  And I think there is in terms

3   of the culpability, there is a, that's an important

4   distinction.

5            THE COURT:  Are you saying that the two crimes, the

6   Western District of Missouri crime is similar to the

7   Philadelphia crime or crimes on this theory of failure of will?

8            MR. TAUBER:  Well I'm going to address the Missouri

9   as well.  So --

10            THE COURT:  -- I can see the failure of will here.  I

11  don't believe Mr. Jones received anything in return for.  It

12  was one check that was the subject of the indictment.

13            MR. TAUBER:  Correct.

14            THE COURT:  The $25,000 check.

15            MR. TAUBER:  Correct.

16            THE COURT:  He received $25,000 from the campaign,

17  the Brady campaign.

18            MR. TAUBER:  Correct.

19            THE COURT:  And he paid that $25,000 to Ms. Cavanes,

20  or Cavasents [phonetic].  Supposedly for services or poll.

21            MR. TAUBER:  Correct.

22            THE COURT:  She didn't own the poll so I believe it

23  was her services.

24            MR. TAUBER:  It was for supposed consulting services.

25  I think the poll was done.

1              THE COURT:  And there were no services?

2              MR. TAUBER:  That's correct.

3              THE COURT:  Cavanes didn't provide any services.

4              MR. TAUBER:  That's correct.

5              THE COURT:  To Mr. Jones.  But in Missouri, five

6    years went by.

7              MR. TAUBER:  Correct.

8              THE COURT:  And he received $972,000.

9              MR. TAUBER:  Correct.

10             THE COURT:  And kept all but two hundred I guess

11   64,000?

12             MR. TAUBER:  Correct.

13             THE COURT:  Do you think they're the same?

14             MR. TAUBER:  Well let me address that.  I'd like to

15   comment on that this way.  The work that Mr. Jones did and he

16   did work.  I mean this was not a no-show job.  This was not

17   money that was being, you know, paid to him with the intent

18   that you know it was going to be spread around for the benefit

19   of Mr. Crandall or others.  Although obviously some of it was.

20   But what's really important here is that, let me just start off

21   by saying that Mr. Jones was introduced to Mr. Crandall by Mr.

22   Crandall's mom, who was a political organizer that Mr. Jones

23   met in the course of presidential primary.  They were doing

24   organizing work in Texas.  She met Mr. Jones.  She thought he

25   might be of service to her son and introduced him.  Her son who

1  was involved in this non-profit, this charity, then hired Mr.

2  Jones to do this work, this problem-solving work.  And the work

3  that Mr. Jones did, if you separated it from the fact that it

4  was being compensated for federal money, none of that work was

5  illegal in itself.

6          THE COURT:  That was the crime.  It was compensated

7  for in federal money.

8          MR. TAUBER:  Correct.

9          THE COURT:  Which was prohibited and Mr. Jones either

10 knew it or turned a blind eye to it.

11         MR. TAUBER:  Correct.

12         THE COURT:  Isn't that correct?

13         MR. TAUBER:  That is absolutely correct.  I just I'm

14 not saying that this is an excuse.  I'm not saying that it's

15 justified.  Again, I'm just trying to find a place to slot this

16 into some degree of culpability.  So I want the Court to

17 understand that the work that was done was constructive work.

18 Was valuable work to the entity which was providing meaningful

19 services to many people.  And I laid out a list of some of the

20 work that Mr. Jones did involve you know reimbursement of

21 expenses for tornado outreach, involved obtaining backpay for

22 work that had been done by employees that you know valid useful

23 employees of the charity.  Various other things.  This was all

24 bonified work.  It should not have been work; it should not

25 have been paid for with federal funds.  And that's completely

1   agreed.  But it was not as though he was engaged in, that he

2   was being paid for activity that was self-elicit.  And another

3   important point I want to make and Mr. Gibson commented on this

4   in a general way.  But at no point in time did Mr. Jones, was

5   he lobbying, Mr. Jones lobbying congress or any government

6   agency for the approval of some new program, a new funding

7   source.  In other words, it wasn't as though Mr. Jones was

8   going to Congress and saying hey, you need to give, you should

9   hire or pay my company to do these things.  It was problem

10  solving for things that were already underway.  And so again,

11  this is not as though Mr. Jones was convincing the government

12  to provide new funds that were then being improperly taken or

13  distributed.  I say this and it may seem, it may seem I don't

14  want the court to feel like I'm splitting hairs.  But I think

15  that there are distinctions in degrees of culpability.  And to

16  the extent that the Court is trying to discern what level of

17  what is an appropriate sentence, what level of responsibility

18  Mr. Jones has, those are important distinctions.  Just in

19  finally, in closing, you know the sanctity of the electoral

20  process is obviously very important.  We don't need to look far

21  around the world to see how you know corruption in government

22  or corruption in a political process is very, very corrosive,

23  and destructive to a society.  There is no question about that.

24  It's something that makes this country great.  That there is

25  you know great fidelity in our system.  I want to, I think it's

1  important to point out that Mr., aside from Mr. Jones' criminal

2  acts which are, you know, are unfortunate and very sad to me,

3  he has spent his life okay, his life's work improving in my

4  view, and I think in any fair view, improving the electoral

5  processes.  By organizing communities to vote for

6  representatives to speak on their behalf.  Traditionally

7  underrepresented, disenfranchised groups.  His work in bringing

8  those groups, gaining those groups for representation, and good

9  representation, is very important.  And I think it vastly

10  improved our electoral system.  And I think it's important to

11  weigh that when determining what a fair sentence is.  In the

12  end, obviously as the Court knows from our memo, we believe

13  that probation is appropriate.  We're asking the Court to

14  impose a sentence of probation.  And we think that is the just

15  result here.

16          THE COURT:  Thank you Mr. Tauber.  Mr. Jones, you now

17  have an opportunity to speak to me about anything you deem

18  appropriate.  It's referred to as your right of allocution.

19  And I'll hear from you from the lectern.  Mr. Tauber will come

20  with you.

21          MR. TAUBER:  You mind if I read Your Honor?

22          THE COURT:  Absolutely no.  Go ahead.

23          MR. TAUBER:  Thank you.

24          THE COURT:  That is permitted.

25          MR. LELAND:  Your Honor, may I briefly before Mr.

1    Jones speaks to the Court?

2             THE COURT:  Yes.

3             MR. LELAND:  Good seeing you again, Your Honor.  So I

4    represented Mr. Jones prior to his indictment and plea here in

5    the Eastern District as well as in Missouri.  Your Honor,

6    probably doesn't know I haven't appeared before you for

7    probably about five years.  I relocated up to Northeast

8    Pennsylvania.  I practice in Scranton.  And I live in a small

9    county up that way.  So through a friend Mr. Jones contacted

10   me.  I did not know him.  And once the case got moving, I

11   brought Mr. Tauber in who is the best that I know to look after

12   Mr. Jones.  I didn't know Mr. Jones then.  Subsequently,

13   ironically, I wanted to share with the Court and I shared with

14   the government this morning, my wife ran for district attorney

15   in a small county up in Northeastern Pennsylvania this past

16   spring.  In a you know what would be a monumental uphill battle

17   for an outsider or not somebody not born there to run up in

18   that community.  And at some point in time, Mr. Jones became

19   aware of that.  And all on his own offered to provide some

20   feedback and advice and no less than probably close to ten

21   times drove up there, spent the entire day with my wife, giving

22   maps and numbers, just providing her feedback and advice

23   because he thought it was the right thing to do.  Wouldn't take

24   anything from the sport.  And so I think that also you know

25   gives the court a window nobody is looking into what the

1  character or something he is.  So I did wanted to share that

2  with the Court.

3          THE COURT:  Thank you very much.

4          MR. JONES:  I'm going to read this, Your Honor.  Your

5  Honor, I started in this business over 30 years ago.  My

6  success was due in a small part to my intellect but into a

7  large part to my integrity.  My integrity is something that I

8  have worn as a badge of honor.  That badge has been sorely

9  compromised now.  My own actions and poor decisions are the

10  reasons that I stand before you here today.  When I made

11  decisions to share a new, what I knew about my own involvement

12  in the illegal conduct, I hope that very small step towards

13  repairing my self-image in that reflection which my loved one

14  saw me.  I pled guilty because I realized that I was not only

15  guilty of crimes, but most importantly I had sold out my

16  integrity.  Sadly, my obligation to tell the truth put my

17  family's life in danger and painted a scarlet letter on all of

18  them.  When I learned that my life had a real threat placed

19  upon it because of my decision to cooperate with law

20  enforcement authorities, my sole concern was that my actions

21  now endangered my family.  I was sick to my stomach just to

22  think how far reaching the repercussions about my criminal

23  behavior.  As you see only a few friends who insisted on coming

24  to support me here, I love them, and I appreciate their

25  insistence on supporting me.  Your Honor, my wife was so

```
1   impacted from the stress of this day, that she was too broken
2   emotionally to come.  My mother is in her 90s and my sister has
3   had a stroke and I would not allow them to come here today.  I
4   do wish, however, to thank all the people who reached out and
5   wrote letters on my behalf.  I would also be remiss if I didn't
6   thank you, Your Honor, and the justice department for treating
7   me with dignity by letting me travel domestically and
8   internationally so that I could try to keep what is left of my
9   business.  In my profession, Your Honor, the two things which I
10  stressed were a simple yes or no to my questions, no excuses,
11  no explanations, and the second was to let my clients know that
12  there were no guarantees.  Your Honor, I am guilty.  No
13  excuses, no explanations.  As far as a guarantee, I can stand
14  here before you and guarantee that this or anything like this
15  will never happen again.  This is the guarantee that you can
16  take to the bank.  I have caused my family and friends
17  unbearable pain.  Suffering both financially, emotionally, and
18  I even placed their lives in jeopardy.  I express my remorse,
19  my shame, and yes my embarrassment to my family and to anyone
20  who has ever viewed me as an honorable man.
21          THE COURT:  Thank you very much.
22          MR. JONES:  Thank you.
23          THE COURT:  Does the government have anything
24  additional they wish to add?
25          MR. GIBSON:  No.
```

1          THE COURT:  Thank you.  Does the government aware of

2    any reason why sentence should not be imposed at this time?

3          MR. GIBSON:  I have not.

4          THE COURT:  Mr. Tauber?

5          MR. TAUBER:  No, Your Honor.

6          THE COURT:  Will you come forward with the defendant?

7    Mr. Jones, sentencing is always difficult for a judge.  It's

8    particularly difficult in this case.  And I say that primarily

9    because of all that you have accomplished in your life, and you

10   have accomplished a great deal.  It was summarized very well by

11   Mr. Tauber, both in his sentencing memorandum, and in the

12   letters.  Gosh I got more letters written on your behalf than I

13   can recall in a long time.  And I read them.  I also read Mr.

14   Tauber's summaries of those letters.  So you should feel very

15   good about all that you have accomplished, particularly in the

16   area of improving the political process and improving the

17   rights of minorities.  And other disenfranchised voters.  You

18   made several mistakes.  The mistake you made in Philadelphia is

19   one that you are thoroughly, I'm sure you have agonized over it

20   over and over again.

21         MR. JONES:  Yes, sir.

22         THE COURT:  But I draw a distinction between what

23   happened in Philadelphia and what happened in Missouri and in

24   other places.  It was the subject of the information in the

25   Western District of Missouri.  In Philadelphia, you were asked

1   to write a check.  The money was paid to you.  And you were

2   asked to write a check to someone else.  And you knew that that

3   was in effect concealing the true nature of the underlying

4   payment.  Which you also knew was part of a series of payments.

5          MR. JONES:  Mm-hm.

6          THE COURT:  And the goal in that series of events was

7   to allow someone to step out of, to withdraw from a primary

8   election campaign in 2012 for the First Congressional District.

9   If that were all that I had in the case, it wouldn't be so

10  troublesome and I think you know pretty clearly what I would

11  have done had that been all that there was in the case.  I am

12  sure you paid attention to the sentencing of Jimmy Moore on

13  Thursday, last week, and you can figure out whether you were in

14  the same position as more, less culpable.  I don't think more

15  culpable but less culpable and you know what would have

16  happened.  But in this case, there is a good deal more.  There

17  are checks totaling $970,000 payable over a five-year period

18  that you knew were unlawful.  You knew you might have been

19  doing work that you thought should have been paid, paid for.  I

20  don't know the details of that work.  Mr. Tauber summarized

21  some of the work you did but he didn't summarize $970,000 worth

22  of work.  But I am going to assume that all of the work you did

23  was awful, the work you did for the two charities was awful.

24  The problem, you were paid with government funds for political

25  advocacy and lobbying.  And that was prohibited and that was a

1  violation of the law.  And you took, I counted them.  There

2  were 41 separate checks totaling $900, you probably know better

3  than I.  $973,807.28.  Each time you took a check you were

4  violating the law and you knew it.  And I think that makes this

5  case a lot different than the case that you would have been

6  defending had you only been involved in the Philadelphia

7  activities.  In deciding on a sentence, I have to consider the

8  goals of sentencing.  First is punishment.  The punishment must

9  be appropriate punishment for the crime.  Not too lenient and

10  not too harsh.  Certainly not too harsh.  The sentence must

11  deter you and others from committing this type of crime in the

12  future.  These types of crimes.  I have no doubt that you are

13  deterred, no doubt in my mind.  You have made it's not a simple

14  mistake.  I think one of your letter writers said this case is

15  an aberration talking about the Missouri case.  Well it can be

16  an aberration if it happens once.  Maybe twice.  But 41 times,

17  I have difficulty and I reject the fact that someone thought it

18  was an aberration.  But I'm sure you're deterred.  I got to

19  know you a little bit as you sat and testified in this

20  courtroom.  And I've read a heck of a lot about you.  Mr.

21  Tauber did a superb job.  And your letter writers, you should

22  read those letters.  I'm sure you have.  But if you feel flat

23  now, you should read those letters.  They'll bully you.  I mean

24  they'll tell you that your life was not wasted.  I've never

25  read as many exemplary letters.  They were well written.  They

1  said what needed to be said.  And they captured your career.

2  Until you got involved in the Philadelphia charges and the

3  Western District of Missouri charges.  In addition to deterring

4  you, and that's not in issue, my sentence must deter others.

5  And the seriousness of the crime, particularly the crime in

6  Missouri should warrant, well requires a sentence that would

7  deter others.  The sentence under they call them the 3553(a)

8  factors, must also provide you an opportunity to continue your

9  rehabilitation.  I don't think you need any more

10 rehabilitation.  But finally and very significantly, my

11 sentence must protect the public interest.  The public has a

12 deep-rooted interest in avoiding undermining the freedom of our

13 election system, our electoral system.  And eliminating hidden

14 and unlawful payments.  For that the only thing I had to

15 sentence you for, I'm not going to commit to what I would have

16 sentenced you for but I think you know.  But that's not and

17 what you did in the Western District of Missouri, I think takes

18 this case to a new, I wouldn't say level, but it's really a new

19 low for you.  You can't do what you did and expect to escape

20 with a slap on the wrist which I consider a probationary

21 sentence to be.  But I'm going to do two things.  I'm going to

22 recognize the extent of your cooperation.  And it was

23 significant.  And I'm also going to recognize your public

24 service.  The work you did in the electoral process for all the

25 time that you did it, warrants some reduction in my sentence.

1    And I am going to fashion a sentence that encompasses both.

2    First, with respect to your cooperation, I think the government

3    said it all.  The guideline sentence is 33 to 41 months.  It's

4    based on a total offense level of 20.  I'm going to depart

5    downward granting the downward departure motion.  I'm going to

6    depart downward six levels.  To a level of 14.  With a total

7    offense level of 14.  In criminal history category one.  The

8    guidelines sentencing range is 15 to 21 months.  Then I'm going

9    to vary downward one level.  To a total offense level of 13.

10   With a total offense level of 13 in criminal history category

11   one.  The guideline imprisonment range is 12 to 18 months.

12   With that being the guideline sentencing range, I'm going to

13   sentence you to a term of one year and one day.  Which means

14   you'll have to serve roughly ten months of incarceration.

15   You're given 50, Mr. Tauber 54 days?

16              MR. TAUBER:  That is correct.

17              THE COURT:  54 or 55?  Four?

18              MR. GIBSON:  54 Judge.

19              THE COURT:  54 days of good time, credit, assuming

20   you were and I'm sure you will.  For each year.  So you'll have

21   to serve one year less 54 days.  I think that sentence

22   accomplishes all of the goals of sentencing, recognizes all

23   that you have done, and also recognizes the seriousness of the

24   offense you committed.  Well I'm not quite finished.  Let me

25   tell you what I'm going to do financially.  The government has

1    taken the position that restitution should not be ordered and I

2    agree and I'm sure you agree.  I don't know what position you

3    have taken on forfeiture.  I think forfeiture should be ordered

4    in the total amount of $900 and let me get the exact figures.

5    It's here somewhere.  $973,802.28.  Is there any objection to?

6            MR. GIBSON:  That was stipulated to in the Western

7    District.

8            THE COURT:  Fine.  I'm not going to impose a fine in

9    addition to the forfeiture.  I am going to impose a special

10   assessment of $200 which is required.  I am going to place you

11   on supervised release for a term of three years.  And now I'm

12   going to impose sentence.  Pursuant to the Sentence Reform Act

13   of 1984, it is the judgment of the Court, the defendant, Donald

14   Jones, is hereby committed to the custody of the Bureau of

15   Prisons to be imprisoned for a year of 12 months and one day on

16   count six of the indictment in criminal number 17-563-01, such

17   term to be served concurrently to a term of imprisonment of 12

18   months and one day.  And one yes, and one day.  On count one of

19   the information in criminal number 19-462, for a total term of

20   imprisonment of one year and one day.  On count six of the

21   indictment in criminal number 17-563-01, and count one of the

22   information in criminal number 19-462.  Let me just check

23   something.  Mr. Lott, I'm going to impose a term of three years

24   of supervised release.  It's not clear from the pre-sentence

25   report whether I can do that on both counts.  I can?

1          MR. LOTT:  Yes, the terms must run concurrently.

2          THE COURT:  Yes, absolutely, that's what I intend to

3     do.

4          MR. LOTT:  Yes.

5          THE COURT:  Three years.  Both counts or?

6          MR. LOTT:  Yes, Your Honor.

7          THE COURT:  All right.  Upon release from

8     imprisonment, defendant shall be placed on supervised release

9     for a term of three years on count six of the indictment and

10    criminal number 17-563-01, such term to be served concurrently

11    to a term of supervised release of three years.  On count one

12    of the information in criminal number 19-462, for a total term

13    of supervised release of three years.  On count six of the

14    indictment in criminal number 17-563-01, and count one of the

15    information in criminal number 19-462.  Within 72 hours of the

16    release from the custody of the Bureau of Prisons, defendant

17    shall report in person to the United States Probation Office in

18    the district to which the defendant is released.  While on

19    supervised release, defendant should not commit another

20    federal, state, or local crime.  Shall comply with the 13

21    standard conditions of supervision that have been adopted by

22    this court.  And shall comply with the following additional

23    conditions.  One, defendant shall not illegally possess a

24    controlled substance.  Two, the periodic drug testing mandated

25    by the violent Crime Control and Law Enforcement Act of 1994,

1  is hereby suspended.  The Court finds that the events of

2  conviction is not drug related and defendant has no current or

3  past history of substance abuse.  Three, defendant shall not

4  possess a firearm or destructive device.  Neither question for

5  the government.  I'm going to sign the forfeiture order.  I

6  don't think I can order; well you tell me.  Am I empowered

7  order checking credit, incurring credit charges prohibited and

8  go through what we normally do when there is a financially

9  penalty imposed by my sentence as opposed to a forfeiture.

10            MR. GIBSON:  I believe you can.

11            THE COURT:  Can I treat it in the same way I treat

12  restitution?

13            MR. GIBSON:  As it relates to?

14            THE COURT:  As it relates to conditions of supervised

15  release.  Which is what we --

16            MR. GIBSON:  -- I don't believe, no, I don't believe

17  that you can make the, is, Your Honor, inquiring about a

18  payment plan for example?

19            THE COURT:  Yes.

20            MR. GIBSON:  No.  My understanding is you cannot do

21  that.  But the forfeiture order is entered as a money judgment

22  against Mr. Jones.  Mr. Jones will be able to subsequently

23  discuss with the government how to go about making those

24  payments and may come to some resolution of a payment plan with

25  the government.  But my understanding is that the forfeiture

1    statute itself does not provide for the Court to order a

2    specific payment plan unlike the situation with restitution.

3              THE COURT:  Am I allowed to order under that

4    forfeiture statute?  For example, defendant shall provide the

5    United States Probation Office with access to requested

6    financial documents or other financial information?

7              MR. GIBSON:  Yes, that you can.

8              THE COURT:  But a prohibition in opening additional

9    lines of credit, no.

10             MR. GIBSON:  I don't know that; I think you can

11   preclude him from doing that as a condition of sentence.  My

12   specific reason for asking about the payment plan was my

13   understanding in the past where that has come up, our

14   forfeiture unit has taken the position that the court doesn't

15   have the authority to get involved in the assigning a

16   particular payment plan.  But as a condition of sentence,

17   particularly where it's a white-collar case, I believe you can

18   regardless of restitution or forfeiture ordered as a condition

19   that a defendant not get additional financial lines of credit

20   without permission of the Court and so forth.  I think they're

21   separate issues.

22             THE COURT:  Do you agree Mr. Tauber?

23             MR. TAUBER:  To be honest Judge, I do not know if

24   there are limitations on the Court as far as the sentence of

25   statute goes.  There is not a financial component, I don't know

1  if the Court can, in other words, I don't know if the condition

2  has to correlate with a condition of sentence. I don't know

3  the answer to that.

4           THE COURT: Maybe Michael Lott knows the answer?

5           MR. LOTT: Your Honor, only I would add that there is

6  as disclaimer on that condition the defendant be in compliance

7  with any payment plan established by the Court. In this case,

8  it's all in the matter how we interpret him being in compliance

9  with the forfeiture order. Which is kind of out of our hands.

10  So you can impose a condition. It is not realistic that our

11  office at any point would come to you to say that he is not

12  being in compliance with it because he opened a line of credit.

13  That's for the defendant and his attorney's office to work out.

14           THE COURT: What about --

15           MR. LOTT: -- But the condition can be imposed.

16           THE COURT: Are you suggesting that the government's

17  rights with respect to forfeiture are governed by the statute?

18  The forfeiture statute? And not by conditions of supervised

19  release?

20           MR. LOTT: Yes, Judge.

21           MR. TAUBER: Yes, Judge I think that's right also.

22           THE COURT: Well what I'm going to do then, I'm not

23  going to impose any separate conditions of supervised release

24  relating to finances. I'm going to leave that to the

25  government to work out. And if there is any disagreement, Mr.

1    Tauber, I'll certainly address it.

2             MR. TAUBER:  Understood.

3             THE COURT:  If the government for example requests

4    that I consider adding some of these conditions, it would make

5    it easier for the government to recover the forfeiture amount.

6             MR. TAUBER:  Understood.

7             THE COURT:  I'll consider it.  I can always amend the

8    conditions of supervised release.

9             MR. TAUBER:  That's fine.

10            THE COURT:  Do you agree with that position?

11            MR. TAUBER:  Yes.

12            MR. GIBSON:  Yes.

13            THE COURT:  Fine.  All right.  The final condition of

14    supervised release is the defendant shall cooperate in the

15    collection of DNA as directed by the United States Probation

16    Office.  The Court finds that defendant has insufficient

17    assets, income, and income earning potential to warrant in

18    positions to fine, in addition to the forfeiture order in the

19    amount of $973,802.28.  Accordingly, a fine is waved in this

20    case.  It is further ordered that defendant shall pay a special

21    assessment of $200 to the United States of America which shall

22    be due immediately and paid.  When can you pay that Mr. Jones?

23            MR. JONES:  I don't have my wallet.  But I mean I can

24    pay tomorrow, whenever.  I mean tell me when.

25            THE COURT:  Well we can give you more time than that.

```
1    But you have to get down here.

2              MR. JONES:  Okay.  Within the next week or two weeks.

3              THE COURT:  We'll make it a week.

4              MR. JONES:  Can I mail it?

5              THE COURT:  I would talk to --

6              MR. GIBSON:  I think Mr. Lehand can probably cover it

7    while he is here Judge.

8              MR. LEHAND:  I'd be happy to, Your Honor, and I'll

9    get back to Mr. Gibson.

10             THE COURT:  Which shall be due immediately and paid

11   on or before 5:00 p.m. on December 23, 2019.  Now self-

12   surrender.  Michael, a date 45 days.

13             COURT OPERATOR:  January 30th.

14             THE COURT:  Pardon me?

15             COURT OPERATOR:  January 30th.

16             THE COURT:  It is further ordered the defendant shall

17   self-surrender at the institution designated by the Bureau of

18   Prisons no later than 2:00 p.m. on January 30th, 2020.  In the

19   event no institution is designated by the Bureau of Prisons as

20   of that date, Defendant shall self-surrender no later than 2:00

21   p.m., on January 30th, 2020, at the Office of the United States

22   Marshall, United States Courthouse, 601 Market Street,

23   Philadelphia, Pennsylvania.  And now my statement of reasons.

24   The Court imposed a non-guideline sentence of one year and one

25   day imprisonment, three years supervised release.  Forfeiture
```

of $973,802.28, and a special assessment of $200.  In imposing

that sentence, the Court considered all of the factors set

forth in 18 United States Code Section 3553(a), including the

nature and circumstances of the crimes of conviction.  False

statements, in violation of 18 United States Code Section

1001(a)(2), and Conspiracy to Commit Theft or Bribery

concerning programs involving federal funding in violation of

18 United State Code Sections 371 and 666(a)(1) and (a)(2) and

the fact that the government filed a motion for downward

departure, under Section 5K1.1 of the guidelines which was

granted.  And the history and characteristics of the defendant.

The defendant is 64 years of age.  He graduated from high

school and took some college courses.  He is married and has

two adult adopted children.  Defendant denied having any

serious or chronic illnesses but noted that he is under the

care of a cardiologist for what was diagnosed as apical

hypertrophic cardiomyopathy.  Defendant denied a history of

mental illness or emotional problems.  Defendant has operated

an international political consulting firm since 1985.

Defendant's political consulting work led to the instant

criminal conviction and the conviction; I better describe that

differently.  Led to the initial criminal conviction in this

district.  And the conviction in the Western District of

Missouri involving government services advocacy and lobbying.

Defendant's criminal conduct was serious.  In criminal number

1  17-563-01, defendant participated in a scheme to conceal the

2  true nature of a payment in the amount of $25,000, made in

3  connection with a series of payments for a candidates agreement

4  to withdraw from the primary election race for the First

5  Congressional District in 2012.  Which served to undermine the

6  federal election system.  The conviction in criminal number 19-

7  462 involves a conspiracy to embezzle $973,807.28 from a non-

8  profit organization.  Which was funded through federal

9  programs.  And which involved over 48 payments, over 40

10  payments over a period of approximately five years in the total

11  amount of $973,802.28.  And bribery.  Notwithstanding

12  defendant's serious criminal conduct, the Court concludes that

13  a sentence of a year and a day is appropriate because of the

14  significant cooperation of the defendant as detailed in the

15  motion to depart downward under Section 5K1.1 of the

16  guidelines.  And defendant's exemplary work for many years in

17  the political empowerment of minorities and disenfranchised

18  communities.  And so enabling summarized in the defense

19  sentencing memorandum.  And the sentence reflects the

20  seriousness of the offenses, promotes respect for the law,

21  provides just punishment for the offenses, affords adequate

22  deterrence to criminal conduct both of the defendant and

23  others, and it protects the public from further crimes of the

24  defendant.  The Court finds that the conditions of supervised

25  release are reasonably related to statutory goals consistent

1  with the policy of the United States Sentencing Commission.

2  And that the liberty deprivation are no greater than are

3  reasonably necessary.  That concludes my sentence.  I must

4  advise the defendant of his appellate rights.  But before I do,

5  is there anything else that needs to be done?  Mr. Tauber?

6          MR. TAUBER:  Just a judicial recommendation of

7  service of the sentences near to Philadelphia as possible.

8          THE COURT:  I will do that.

9          MR. TAUBER:  If the Court will indulge us.

10          THE COURT:  Mr. Gibson, anything else?

11          MR. GIBSON:  No, Your Honor, not from the government.

12          THE COURT:  Fine.  First, the recommendation.  The

13  Court recommends to the Bureau of Prisons that defendant be

14  designated to an institution in close proximity to

15  Philadelphia, Pennsylvania where his family resides.  And now,

16  your appellate rights.  If you believe I have just imposed an

17  unlawful sentence, or if you think error was committed in the

18  proceeding, in which you pled guilty and if you think an appeal

19  is permitted by your guilty plea agreement with the government,

20  then you must file a notice of appeal in this court within 14

21  days.  To do that, you must tell Mr. Tauber within the 14-day

22  period to file the notice of appeal on your behalf.  Do you

23  understand that?

24          MR. JONES:  Yes, I do.

25          THE COURT:  All right, I don't think anything else

1  remains to be done.  Well I'm not so sure but thank you for

2  reminding me.  Mr. Tauber reminded me about sealing.  I think

3  all of the cooperation has been made public.  Am I correct on

4  that Mr. Tauber?

5          MR. TAUBER:  The fact of it has been yeah.  It's,

6  yeah that's fine.

7          THE COURT:  In other words, well long way of getting

8  at.

9          MR. TAUBER:  Yeah.

10          THE COURT:  Is there a need to seal this record or in

11  part?

12          MR. TAUBER:  Yeah.  Yeah.  Well Mr. Jones would ask

13  that it be sealed.

14          THE COURT:  Mr. Gibson?

15          MR. GIBSON:  Judge, similarly to the issue that came

16  up in Mr. Smukler's sentencing, I don't know that that's

17  appropriate particularly where the Court has taken into account

18  recommendations made in the defendant's sentencing memorandum

19  and arriving at its sentence.  There is no detailed recitation

20  of the defendant's cooperation on the public docket.  The 5K1

21  motion was sealed.  But I think that's the extent of it.  The

22  government's sentencing memorandum and the defense sentencing

23  memorandum should remain part of the public record.

24          THE COURT:  Well there is no mention of cooperation

25  in the defendant's sentencing memorandum.

1          MR. TAUBER:  That is not a record as of this point.

2   I was going to file that with a request to seal that.

3          THE COURT:  Well you do?

4          MR. TAUBER:  Yeah there is evidence.

5          THE COURT:  One very short paragraph.  Then you lump

6   it with post-defense acceptance of responsibility.

7          MR. TAUBER:  My only concern was given that there is

8   a threat history in Mr. Jones' case, that makes this a little

9   different than even Mr. Smukler and others that compensative to

10  that situation.

11         MR. GIBSON:  Judge, just as it relates to Mr.

12  Cranford, I mean, he has been incarcerated, convicted, and

13  sentenced.  I don't know, I just generally don't agree that

14  there is a basis to seal the sentencing papers.  As opposed to

15  say the 5K1 motion and as, Your Honor's already recognized, the

16  fact that cooperation took place is a matter of public record

17  reported publicly.  That bottle, I mean, that genie can't be

18  put back in the bottle.

19         MR. JONES:  No, I agree with that, Your Honor.

20  That's fine.

21         THE COURT:  Well we'll seal then the downward

22  departure motion.

23         MR. GIBSON:  Yeah, that's already sealed, Judge, I

24  believe.

25         THE COURT:  My 5K1 order, the Torres Order.

1              MR. GIBSON:  Yes, Your Honor.

2              THE COURT:  It hasn't been sealed.  I haven't done it

3    yet.

4              MR. GIBSON:  No but our request in filing the motion

5    for downward departure requested sealing of that order as well.

6              THE COURT:  All right, we'll seal both.  The downward

7    departure motion and the order granting that motion and nothing

8    else.  The defendant is agreeing to that.  If there is any

9    change, let me know and I'll handle it on an expedited basis.

10             MR. TAUBER:  I appreciate that.

11             THE COURT:  If you don't agree, we'll try to get you

12   to agree and if you can't --

13             MR. TAUBER:  -- Appreciate that, Your Honor.

14             THE COURT:  -- we'll have a mini hearing and we'll

15   get it resolved.

16             MR. TAUBER:  Very well.

17             THE COURT:  And now is there anything else Mr.

18   Gibson?  Anything else that needs to be --

19             MR. GIBSON:  -- Not from the government, Your Honor.

20             THE COURT:  Well I thought the sentencing was very

21   presented.  Both sides.  Not a surprise.  And I thank you both

22   very much.  I also want to thank Mr. Lott.  His pre-sentence

23   report rivals the longest I have received and you can tell by

24   all of the notes that I have read it.  I wish you well Mr.

25   Jones.

```
 1              MR. JONES:  Thank you, Your Honor.

 2              THE COURT:  I'm sure you're feeling not so hot now.

 3   I did what I thought I had to do and I wish you well.  I think

 4   you're going to come out from under this quickly.  And while

 5   you're in custody, you're so talented, perhaps you can find a

 6   way to help some of the others who are not nearly as talented

 7   as you are.  I leave that to you.  With that, Court is

 8   adjourned.  Thank you very  much.

 9              MR. TAUBER:  Thank you, Your Honor.

10              COURT OPERATOR:  All rise.

11              THE COURT:  You may go about your business everyone.

12                            *  *  *  *  *
```

## **C E R T I F I C A T I O N**

I, Lynn M. Reinhardt, a court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_Lynn M. Reinhardt_
_____

Lynn M. Reinhardt


DATE:  July 31, 2023